WILLIAM E. GREENE and ADELAIDE GREENE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Greene v. Commissioner
Docket No. 7997-80.
United States Tax Court
T.C. Memo 1983-653; 1983 Tax Ct. Memo LEXIS 133; 47 T.C.M. (CCH) 190; T.C.M. (RIA) 83653; October 27, 1983. James V. Walker and John Meadows, for the petitioners. Ben G. Reeves, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1976 in the amount of $40,380.05. By amendment to his answer, respondent asserts an increased deficiency, making the total claimed deficiency $44,903.45. The issue for decision is whether the non-compensatory $150,000 portion of the $225,000 in total *134 damages recovered by petitioners in an antitrust suit is properly to be treated as long-term capital gain or as ordinary income. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife who resided in Tallahassee, Florida, at the time of the filing of their petition in this case, filed a joint Federal income tax return for the calendar year 1976 with the Internal Revenue Service in Atlanta, Georgia. Mr. Greene (petitioner) was engaged in the business of a wholesale distributor of food products from 1954 through 1975. Petitioner, with the assistance of Mrs. Greene, operated this business as a sole proprietorship. Petitioner purchased the products of different manufacturers for resale to customers, which included restaurants, grocery stores, and hotels in the Tallahassee area. Petitioner owned a warehouse in which he stored the products purchased by him for resale. Petitioner also employed several salesmen to solicit orders from different customers in the area in which he sold. In 1971 petitioner filed an antitrust suit under the Sherman Act against General Foods Corporation (General Foods) in the United States *135 District Court for the Northern District of Florida. This lawsuit was based primarily on General Foods' alleged actions in fixing the prices at which petitioner could resell the products he purchased from it and in terminating him as a distributor of its products when he expressed his dissatisfaction with such actions. Petitioner moved to the Tallahassee area in 1954 to establish his food distributorship business at the urging of General Foods. At least half of the sales of food products made by petitioner in his business were of General Foods products. A major General Foods product sold by petitioner was coffee. The General Foods coffee sold by petitioner included Yuban, Maxwell House and MHC. Petitioner in his business sold the General Foods products to two types of accounts: (1) regular accounts referred to as down-the-street accounts and (2) multiple food service accounts (MFSA). Petitioner was free to sell General Foods products to a down-the-street account customer at whatever price he desired, although General Foods did propose suggested retail prices at which he should sell the products. However, with MFSA customers General Foods required petitioner to sell its products *136 at prices which it set for all MFSA customers. An MFSA customer was typically a potential large-volume purchaser which did business in at least several locations. Among the MFSA customers to whom petitioner sold his products were hotel and restaurant chains. The customer would apply to General Foods to be classified as an MFSA account. Upon being classified as an MFSA account, he would be entitled to purchase General Foods products from the distributors of General Foods products at prices set by General Foods in its MFSA price list. The prices at which MFSA customers were allowed to purchase General Foods products were lower than the prices at which the products would be offered to customers who were down-the-street accounts. At the time it processed an application by a prospective purchaser to be classified as an MFSA account, General Foods would decide whether the applicant would be extended credit or would have to make purchases for cash. The MFSA customer would place its order for the General Foods products which it desired with the distributor of the products, who would make delivery from his stock. The distributor would receive a fixed percentage amount of the sale he *137 made to the MFSA customer. General Foods required the distributor to use a particular invoice from in making a sale to an MFSA customer. A copy of this invoice would be furnished to General Foods. If the sale was for cash, the distributor would remit the money, less the fixed percentage amount and his cost for the goods. If the sale was on credit, the MFSA customer would make payment to General Foods and General Foods would then be responsible for collecting the account receivable generated from the credit sale. General Foods, upon receiving a copy of the invoice for the credit sale, would immediately credit the distributor with the fixed percentage amount and his cost of the goods. The distributor could use the amounts owed to him by General Foods from these credit sales to MFSA customers to offset the amounts which he owed to General Foods for the products he had purchased. General Foods generally found it to be more profitable to sell its products to independent distributors like petitioner where possible. General Foods would directly distribute its products only when it could not find a satisfactory independent distributor for an area. Under his distribution agreement *138 with General Foods, petitioner was required to use his best efforts to sell General Foods products. However, he was not required to offer General Foods products exclusively and could sell the products of other manufacturers. The agreement provided for termination by either party after the giving of 60 days' notice to the other party. Petitioner, by 1970, had become dissatisfied with the requirement that he make sales to MFSA customers at prices set by General Foods in its MFSA price list. Petitioner considered the percentage profit allowed him by General Foods on the MFSA sales which he made to be too low and that therefore the profit which he would otherwise make in his business was greatly reduced. Petitioner expressed his dissatisfaction to General Foods and asked that it buy his distributorship. General Foods, on January 5, 1971, terminated petitioner as a distributor of its products. General Foods, subsequent to the termination, bought from petitioner all of the General Foods products which he had previously purchased and which were stored in his warehouse. After this termination, petitioner continued to operate his food distributorship business until 1975. The complaint *139 filed by petitioner in his suit against General Foods contained four counts. In count I of the complaint, petitioner alleged that General Foods had engaged in illegal price-fixing in violation of the Sherman Antitrust Act, 15 U.S.C. sec. 1. Counts II, III and IV of the complaint were predicated on the diversity jurisdiction of the Federal District Court. In count II, petitioner alleged that General Foods had interfered with and injured petitioner's business relationship with his customers, and had also interfered with and injured petitioner's relationship with his employees. In count III of the complaint, petitioner alleged that General Foods had engaged in unfair trade practices against him. Lastly, in count IV of the complaint, petitioner alleged that General Foods had breached the terms of the distributorship agreement by terminating him without the giving of 60 days' prior notice. The case in the United States District Court for the Northern District of Florida was tried to a jury. In January of 1974, the jury awarded petitioner $75,000 plus reasonable attorney's fees and costs. The $75,000 award represented compensatory damages both for lost past *140 profits due to the price-fixing practiced by General Foods and for lost future profits from its termination of him as a distributor when he indicated his reluctance to cooperate with it in such price-fixing. [1]
*141 Pursuant to section 4 of the Clayton Act, 15 U.S.C. sec. 15, the jury award of $75,000 was trebled by the district court. General Foods appealed from the lower court's decision. The United States Court of Appeals for the Fifth Circuit, however, affirmed the lower court's decision on August 11, 1975. See Greene v. General Foods Corp.,517 F.2d 635 (5th Cir. 1975). Petitioner realized $339,984.35 in gross income in 1976 as a result of the satisfaction of the judgment entered in his favor in the suit against General Foods. The $339,984.35 of gross income consisted of the $75,000 of compensatory damages, $150,000 of non-compensatory trebled damages, $69,527.36 awarded to him for the court costs and attorney's fees, and $45,456.99 of interest. Petitioner's attorneys collected the $339,984.35 due him from General Foods. From this $339,984.35, petitioner's attorneys remitted to petitioner $202,979.98, which represented the net amount due him after they had deducted $137,004.37 for their fees and costs. Petitioners on their 1976 income tax return reported the $75,000 in compensatory damages recovered by them as a short-term capital gain *142 from the sale of an asset held for less than 6 months. Petitioners claimed a cost or other basis in such asset in the amount of $65,354.61 and computed a gain of $9,645.39. Petitioners in their return further characterized the $150,000 in non-compensatory damages awarded them as an award for the loss of goodwill. On the return, petitioners stated that they had no basis in the goodwill and reported the entire $150,000 as a long-term capital gain. Petitioners on the return also reported receipt of $27,803.79 of interest income from General Foods. Respondent in his notice of deficiency determined that the $225,000 in damages recovered by petitioner in his law-suit against General Foods was taxable as ordinary income, rather than as capital gains. Respondent in an amendment to his answer made claim for an increased deficiency in income tax. Respondent, in support of this claim, alleged as follows: (a) The petitioners during the year 1976 received payment in the amount of $202,979.98 in satisfaction of a second amended judgment dated January 2, 1974. The payment of $202,979.98 was a net payment reflecting gross income of $339,984.35 and deductions of $137,004.37 computed as follows: *143 Final Judgment of Antitrust Award
$225,000.00
Court Costs and Attorney Fees
69,527.36
TOTAL
294,527.36
Interest from August 15, 1973 to
March 11, 1976
45,456.99
Total Final Judgment and Interest
339,984.35
Less: Attorney Fees and Court Costs
137,004.37
Net to Petitioners
$202,979.98
(b) With respect to the payment described in subparagraph (a) above, petitioners reported on their 1976 Federal income tax return a total payment of $252,803.00 less attorney fees and court costs of $65,345.61 for a net of $187,457.39. Respondent in the amendment to answer asserted that petitioners had an additional $15,522.59 of ordinary income which they had not reported on their 1976 return. Respondent therefore claims that the deficiency in petitioners' income tax for the year 1976 is in the amount of $44,903.45, rather than the $40,380.05 previously determined by him in the notice of deficiency. Petitioner does not contend that the $75,000 recovered as compensatory damages is taxable as capital gains rather than ordinary income. Also, the parties have stipulated that petitioners in 1976 realized $339,984.35 in gross income from the satisfaction of the judgment *144 in the antitrust suit, which consisted of $75,000 of compensatory damages, $150,000 of non-compensatory trebled damages, $69,527.36 of awarded court costs and attorney's fees, and $45,456.99 of interest, and that petitioner in 1976 incurred $137,004.37 of legal fees and costs. OPINION Petitioner contends that the $150,000 represented damages awarded to him for loss of goodwill. Respondent, on the other hand, contends that the $150,000 awarded by the district court in addition to the $75,000 in compensatory damages determined by the jury is, as a matter of law, ordinary income. We agree with respondent that the $150,000 in damages recovered by petitioner in his antitrust suit, in addition to the $75,000 in compensatory damages, the characterization of which petitioner does not dispute, is ordinary income, not capital gain. In Roemer v. Commissioner,79 T.C. 398, 409-410 (1982), revd. 716 F.2d 693 (9th Cir. 1983), [2] this Court expressly held that punitive damages, to the extent they are taxable, constitute ordinary income. In so holding, we relied heavily on the statement of the Supreme Court in Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 432 (1955), *145 that punitive damages cannot be considered as a restoration of capital for taxation purposes. Although the Supreme Court in the Glenshaw Class Co. case did not have presented to it the precise issue of whether the non-compensatory damages portion of the taxpayer's recovery would be taxed as ordinary income, we see no basis for distinguishing our holding on this matter in Roemer v. Commissioner,supra, *146 from the instant case. In fact, this Court and other courts in reliance on the statement made by the Supreme Court, have expressed the view that the non-compensatory trebled damages portion of an antitrust award is taxable as ordinary income. See Thomson v. Commissioner,406 F.2d 1006, 1008-1009 (9th Cir. 1969), affirming a Memorandum Opinion of this Court; Carter's Estate v. Commissioner,298 F.2d 192, 194-195 (8th Cir. 1962), affg. 35 T.C. 326 (1960); Cullins v. Commissioner,24 T.C. 322, 328 (1955). Further, the evidence does not support petitioner's contention that the $150,000 portion of the trebled damages recovered represented actually or in substance a payment made to him for loss or injury to goodwill. Petitioner recovered the $150,000 in issue from General Foods pursuant to the provision of section 4 of the Clayton Act, 15 U.S.C. sec. 15. After the jury had determined that he was entitled to an award of $75,000 in compensatory or actual damages, the $150,000 in issue was awarded to petitioner as a result of the district court's tripling of the damages awarded by the jury. *147 The jury's sole function had been to determine the actual damages to which petitioner was entitled. The trebling was mandatory and was solely a matter handled by the district court. See Pollock and Riley, Inc. v. Pearl Brewing Co.,498 F.2d 1240, 1242-1243 (5th Cir. 1974). Thus, it is clear to us that the $150,000 was not awarded to petitioner to recompense him for loss of the goodwill, if any, that he had possessed in his food distributorship business. The statute which provides for the awarding of triple damages to the successful plaintiff in an antitrust suit was enacted by Congress not only to compensate those injured but for the purpose of encouraging private antitrust litigation to vindicate the important public interest in free competition. See Zenith Radio Corp. v. Hazeltine Research, Inc.,395 U.S. 100, 130-131 (1969); Fortner Enterprises, Inc. v. United States Steel Corp.,394 U.S. 495, 502 (1969). The non-compensatory portion of such *148 an award is in addition to, and awarded entirely apart from, the successful plaintiff's actual damages. Such damages are entirely akin to the punitive damages awarded in any ordinary action where exemplary or punitive damages are awarded. See Englander Motors, Inc. v. Ford Motor Co.,293 F.2d 802, 806-807 (6th Cir. 1961). We hold, therefore, that the $150,000 recovered by petitioner did not represent compensation awarded to him for loss or injury to goodwill. The $150,000 clearly represented ordinary income. [3]
Decision will be entered under Rule 155.
Footnotes
1. These were the claims left in the case when it was submitted to the jury. Earlier in the trial, petitioner, on cross-examination by counsel for General Foods, had admitted that he was no longer pursuing his other claims that General Foods had interfered with and injured his business relationships with his customers and employees and had engaged in unfair trade practices. Additionally, the expert witness whose testimony petitioner offered in establishing the amount of damages, while of the opinion that total damages for lost past and future profits were in the amount of approximately $150,000, had given an opinion that $17,793.31 was the amount of damages for past lost profits. The district court, moreover, gave the following instruction to the jury concerning the awarding of damages for lost future profits: Now, in this case General Foods has terminated the Greene distributorship. General Foods can terminate the distributorship with or without cause, but if you find from the preponderance of the evidence that the distributorship was terminated as a result of the alleged violation of the federal anti-trust laws concerning price fixing you are to award future damages, that is, the damages if any which have or will occur from or after the date of termination.↩
2. In the Roemer case, this Court concluded in part that (1) the taxpayer failed to establish that the damages, both compensatory and punitive, awarded to him by a jury as a result of an action for libel under sec. 45 of the California Civil Code↩, were on account of personal injury and thus the damages were not excludable under sec. 104(a)(2); and (2) the damages, compensatory and punitive, constituted ordinary income rather than capital gain. The United States Court of Appeals for the Ninth Circuit, in reversing, concluded that the damages, compensatory and punitive, were excludable under sec. 104(a)(2). The circuit court thus did not reach the issue of ordinary income versus capital gain.Accordingly, we need not consider whether we agree with the circuit court's reversal.
3. We also consider the record to be clear that the $75,000 in compensatory damages awarded to petitioner by the jury was to compensate him for loss of past and future profits and was in no way payment for goodwill or going-concern value.↩