T.C. Memo. 2011-241

UNITED STATES TAX COURT

HEALTHPOINT, LTD., DFB PHARMACEUTICALS, INC., TAX MATTERS
PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25736-09.                    Filed October 3, 2011.

Gregg R. Kosterlitzky and Gerald L. Brantley, for
petitioner.

Daniel J. LaVassar and David Q. Cao, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  Respondent sent a notice of final partnership
administrative adjustment (FPAA) for 2004 to Healthpoint, Ltd.
(Healthpoint).  DFB Pharmaceuticals, Inc. (petitioner), the
designated tax matters partner for Healthpoint, filed a timely

petition for readjustment with the Court.  The issues for decision are:  (1) Whether the proceeds of a particular settlement agreement are taxable as capital gains or ordinary income; and (2) whether petitioner is liable for a penalty under section 6662(a).  The Court requested that the parties in their posttrial briefs address the jurisdiction of the Court with respect to the section 6662(a) penalty.  The parties agree, and the Court concludes, that we have such jurisdiction in this case.  See 106 Ltd. v. Commissioner, 136 T.C. 67 (2011).

Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.  Healthpoint is a Texas limited partnership.  At the time the petition was filed, Healthpoint's principal place of business was in Texas.

Healthpoint is a specialty pharmaceutical company which, at all relevant times, had three primary divisions, including a tissue management division.  Healthpoint sold the tissue management division in 2008 but retained ownership of some of its products, including Accuzyme.  Accuzyme is a prescription

ointment that uses a combination of urea and an enzyme called papain to eliminate necrotic tissue from wounds, a process known as debriding. Healthpoint owns the exclusive rights to the Accuzyme trademark and associated goodwill and spent millions of dollars to promote successfully Accuzyme nationally. Consequently, by 2001, Accuzyme had become the most prescribed papain-urea debriding ointment on the market.

Ethex Corporation (Ethex), a wholly owned subsidiary of KV Pharmaceuticals, Inc., introduced a product, Ethezyme, which was packaged and marketed as a generic form of Accuzyme. Ethezyme, however, contained an additional potentially harmful chemical and more papain than Accuzyme. Ethex's marketing strategy, however, caused practitioners and consumers to believe that Ethezyme was a generic equivalent of Accuzyme and could be used as a substitute. When patients had negative results after using Ethezyme, practitioners did not order Accuzyme in place of Ethezyme because Ethex had marketed Ethezyme as a generic version of Healthpoint's product. Subsequently, many consumers were driven out of the papain-urea debridement ointment market altogether.

On August 3, 2000, Healthpoint filed suit (Ethex I) in the U.S. District Court for the Western District of Texas (District Court), claiming that Ethex was liable for false advertising, unfair competition, and trademark dilution under the Lanham Act and unfair competition, misappropriation, and business

disparagement under Texas law. The parties attempted to reach a settlement agreement through mediation before trial, but were unsuccessful. At trial in Ethex I, Healthpoint presented expert testimony that profits it lost as a result of Ethex's conduct caused $3,498,905 in actual damages. Healthpoint's vice president of sales also testified that sales were approximately $1 million lower than projected for 2000 and $5 million lower than projected for 2001.

On July 18, 2001, while the Ethex I litigation was ongoing, Healthpoint filed another suit against Ethex (Ethex II) in the District Court. In Ethex II, Healthpoint alleged that Ethex was marketing a new formulation of Ethezyme, Ethezyme 830, as a generic equivalent to Accuzyme. Healthpoint claimed Ethex was liable for false advertising, unfair competition, and trademark dilution under the Lanham Act and Texas law, as well as for theft of trade secrets. Healthpoint attempted to join the claims related to Ethezyme 830 to Ethex I, but the District Court ruled that it was too late to do so.

On September 28, 2001, the jury in Ethex I returned a verdict in favor of Healthpoint. The jury found that Ethex had engaged in false advertising under Federal law and acts of unfair competition under Federal and Texas law and that Ethex had acted with malice when it engaged in misconduct under Texas law. The jury did not find, however, that Ethex had knowingly or

intentionally diluted Healthpoint's trademark or disparaged Healthpoint's business.

On October 4, 2001, Healthpoint publicized this verdict via a press release titled "Texas Jury Sends Strong Message to Ethex Corporation". On December 10, 2002, the District Court released its Findings of Fact and Conclusions of Law. The jury awarded $16.47 million, of which $16,163,545 went to Healthpoint. The damages were allocated as follows:

| Damage | Amount |
|---|---|
| Actual damages | $5,000,000 |
| Disgorgement of Ethex's profits from false advertising and unfair competition | 1,640,000 |
| Punitive damages | 3,174,515 |
| Lanham Act enhanced damages | 6,349,030 |

Ethex filed an appeal with the Court of Appeals for the Fifth Circuit, and Healthpoint and Ethex attempted to reach a settlement in Ethex I through the required mediation procedure. When this was unsuccessful, the parties attempted to resolve Ethex II and the appeal of Ethex I in a second formal mediation attempt that was also ultimately unsuccessful.

In December 2003, Healthpoint and Ethex began direct settlement negotiations. At that time Healthpoint proposed settling both cases for approximately $25 million, and Ethex proposed settling both cases for $8 million. Both offers were

rejected. In December 2003, Ethex proposed settling the cases with a royalty arrangement on profits from future sales of Ethezyme. Healthpoint rejected that offer and countered with an offer of $13 million plus a royalty and some additional terms. Ethex also rejected the counteroffer and offered $9 million immediately, $250,000 payable over 4 years, and royalty payments on increased sales of Ethezyme 830. Healthpoint declined this offer, and settlement negotiations ceased temporarily.

In August 2004, shortly before the scheduled trial in Ethex II and oral arguments in the appeal of Ethex I, Healthpoint and Ethex resumed settlement discussions. The parties agreed to settle Ethex I for $12 million and Ethex II for $4.5 million.

Though the parties had agreed to the amount of the settlement, the discussion surrounding the nondisparagement and confidentiality provisions remained contentious. Ethex wanted Healthpoint jointly to request a vacatur of the pleadings in Ethex I to remove them from the public record, but Healthpoint declined. Ultimately, the parties agreed to a nondisparagement clause that permitted Healthpoint to use public domain documents (e.g., the pleadings, the findings of fact, etc.) to promote Accuzyme and distinguish it from Ethezyme, coupled with terms that prohibited Ethex from using the settlement agreement for those same purposes.

On August 29, 2004, Ethex sent Healthpoint a proposed settlement agreement. Out of the $16.5 million agreed upon, that draft proposed allocating $12 million to "compensatory damages arising out of alleged unintentional product disparagement" to settle Ethex I and $4.5 million with the same description to settle Ethex II.

Healthpoint subsequently sent Ethex its proposed settlement agreement. Healthpoint's tax counsel prepared an outline of the categories of damages the agreement would include but did not assign any amounts to those categories. Without the aid of tax counsel, Healthpoint then proposed allocating $15.8 million as follows:

| Damage | Amount |
|---|---|
| **Ethex I** | |
| Lanham Act--false advertising: | |
| Damage to goodwill and reputation | $7,600,000 |
| Lost profits/disgorgement of profits | 1,250,000 |
| Unfair Competition: | |
| Damage to goodwill and reputation | 1,750,000 |
| Lost profits/disgorgement of profits | 100,000 |
| Punitive damages | 1,100,000 |
| | |
| **Ethex II** | |
| Lanham Act--false advertising: | |
| Damage to goodwill and reputation | 2,350,000 |
| Lost profits/disgorgement of profits | 450,000 |
| Unfair Competition: | |
| Damage to goodwill and reputation | 1,200,000 |

Healthpoint also proposed allocating $500,000 to DPT

Laboratories, Ltd. (DPT), not a party to this case, to settle a

claim for misappropriation of trade secrets in Ethex II, $150,000

of the proceeds from Ethex I to DPT for damage to goodwill and

reputation, and $50,000 of the proceeds from Ethex I to DPT for

lost profits.  Ethex responded to that proposal with an email

stating that

> under no circumstances could * * * [Ethex] ever agree that
> any part of this settlement is for anything that might be
> associated with willful misconduct.  We feel strongly that
> this characterization of our conduct is completely
> unjustified.  These accusations have been injurious to our
> reputation, and we will not do anything that might be
> interpreted as conceding that we acted in a knowing manner.

Healthpoint believed that it would be unable to reach an

agreement without complying with this request and subsequently

acquiesced to Ethex's demand to eliminate allocations to

misappropriation and punitive damages.  Ethex permitted

Healthpoint to reallocate the $500,000 payable to DPT

Laboratories to settle Ethex II and the $1.1 million punitive

damages to other categories without objection.

On September 2, 2004, Ethex and Healthpoint signed the

settlement agreement resolving Ethex I and Ethex II.  The damages

were allocated under the settlement agreement as follows:

| Damage | Amount |
|---|---|
| Ethex I | |
| Damage to goodwill and reputation | $10,450,000 |
| Lost profits/disgorgement of profits | 1,350,000 |
| Ethex II | |
| Damage to goodwill and reputation | 4,050,000 |
| Lost profits/disgorgement of profits | 450,000 |

The $200,000 Healthpoint proposed allocating to DPT to settle Ethex I remained in the final settlement agreement and is not at issue in this case. The settlement agreement also included the statement that "no part of the sums paid pursuant to this Agreement are for willful misconduct" or for punitive damages.

Healthpoint did not maintain any business documentation relating to goodwill or make any calculations during the settlement negotiations to justify the allocations in the agreement. Healthpoint was aware that allocating money to items of ordinary income rather than capital gain would generate a higher tax burden. Healthpoint's tax counsel was not involved in any discussion of the total amount of the settlement or the amount of each individual allocation.

Healthpoint filed a Form 1065, U.S. Return of Partnership Income, on April 11, 2005. With respect to the proceeds of the settlement, it reported $14.5 million in long-term capital gain and $1.8 million in ordinary income. The Internal Revenue Service examined Healthpoint's 2004 tax return. The FPAA

contained determinations that all proceeds of the settlement were ordinary income to Healthpoint and that the section 6662(a) penalty applied. Respondent now concedes that Lanham Act enhanced damages of $6,349,030 awarded by the jury for loss of goodwill are taxable as long-term capital gain.

## OPINION

Petitioner argues that we should respect the allocations made in the settlement agreement, and respondent argues that we should apply the allocations made by the jury in Ethex I. The parties agree that proceeds of the settlement determined to be for goodwill or damage to reputation are taxable as capital gain and that proceeds determined to be lost or disgorged profits or punitive damages are taxable as ordinary income. See secs. 1221, 61(a); Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1955).

The parties agree that petitioner does not qualify for a shift in the burden of proof under section 7491 because of the net worth limitations of section 7491(a)(2)(C). Thus petitioner bears the burden of proving that respondent's allocation of the settlement proceeds is erroneous. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992).

## Allocations by the Settlement Agreement

Where damages are received pursuant to a settlement agreement, the tax consequences of the settlement depend on the nature of the claim that was the basis for the settlement, rather

than the validity of the claim. United States v. Burke, 504 U.S. 229, 239 (1992). The determination of the nature of the underlying claim is a factual one and is generally made by reference to the settlement agreement considered in the light of the facts and circumstances surrounding the settlement. Robinson v. Commissioner, 102 T.C. 116, 126 (1994), affd. in part and revd. in part and remanded on another issue 70 F.3d 34 (5th Cir. 1995). Where there is an express allocation in the settlement agreement between the parties, it will generally be followed in determining the allocation for Federal income tax purposes if the settlement agreement is entered into by the parties in an adversarial context at arm's length and in good faith. Id. at 126-127. However, an express allocation set forth in the agreement is not necessarily determinative if other facts indicate that the payment was intended by the parties to be for a different purpose. Bagley v. Commissioner, 105 T.C. 396, 406 (1995), affd. 121 F.3d 393 (8th Cir. 1997). Thus, judicial approbation of express settlement allocations for Federal income tax purposes is not warranted where circumstantial factors reveal that the designation of the settlement proceeds was not the result of adversarial, arm's-length and good faith negotiations and is incongruous with the "economic realities" of the taxpayer's underlying claims. See id. at 406-410.

Petitioner relies primarily on McKay v. Commissioner, 102 T.C. 465 (1994), vacated on other grounds without published opinion 84 F.3d 433 (5th Cir. 1996), to justify allocating the settlement proceeds consistent with the written agreement for tax purposes. In McKay, the taxpayer received a settlement from his employer in a lawsuit including, among other things, a claim for breach of his employment contract and a wrongful discharge tort claim. Before the settlement, the taxpayer received a favorable judgment of approximately $12 million on the contract claim and $2 million on the tort claim. Finding that the employer violated the Racketeer Influenced and Corrupt Organizations Act (commonly known as RICO), the jury applied treble damages and awarded $43 million to the employee. The settlement agreement gave the taxpayer similar actual damages of approximately $14 million, excludable under section 104(a)(2), but expressly disclaimed any payment of punitive or treble damages that would have been taxable as ordinary income. Because these allocations were roughly the same as the jury verdict with respect to the contract and tort claims and reflected an arm's-length and adversarial negotiation process, we determined that the allocations in the settlement agreement were the "clearest embodiment of the payor's intent in the instant case." Id. at 484.

Respondent cites Bagley v. Commissioner, supra, to support his position that the allocations in the settlement agreement

should not be respected. The Court of Appeals for the Eighth

Circuit affirmed our decision to disregard the express

allocations of the settlement agreement and stated that

> proof of a defendant's desire or intent not to show an
> award of punitive damages does not establish that the
> defendant did not pay something to avoid punitive
> damages, where there is solid evidence that the
> prospect of punitive-damages liability necessarily
> increased the amount that the defendant paid in
> settlement.

Bagley v. Commissioner, 121 F.3d at 396.

Petitioner argues that Ethex and Healthpoint were adverse

throughout the entire negotiating process and thus the agreement

must be respected. Petitioner points out numerous instances

throughout the settlement negotiations where the parties

disagreed. However, general adversity between the parties to a

lawsuit is to be expected. The requirement that parties involved

in settlement negotiations be adverse is a factor in determining

whether the final agreement reflected the true intentions of the

parties involved. If the parties were generally adverse but

ultimately allocated the funds in a way that did not represent

the claims they actually intended to settle, then we need not

respect the allocations made in the settlement agreement.

Petitioner argues that Ethex refused to pay the punitive

damages Healthpoint had included in its first draft settlement

agreement, thus proving that the allocations were the product of

adverse negotiations. However, the circumstances indicate not

that Ethex would not pay any amount relating to punitive damages, but simply that they could not be labeled as such. The amount of the settlement was not disputed at the time Ethex objected to the punitive damages allocation included in Healthpoint's draft settlement agreement. Ethex was indifferent as to how Healthpoint chose to allocate the funds so long as the allocation did not imply intentional wrongdoing, and it permitted Healthpoint to assign the same amount of damages to any other category. The limitations Ethex put on the labeling of damages are insufficient to establish that the allocations in the agreement are the product of adversity between the parties.

Furthermore, it is unlikely that Healthpoint would have desired to include punitive damages or additional items in the settlement that would be taxed as ordinary income. Healthpoint was aware that the settlement allocations proposed by Ethex would result in a more favorable tax rate. Healthpoint may have desired to demonstrate wrongdoing on the part of Ethex. It is unlikely, however, that referring to punitive damages in a settlement agreement with a nondisparagement clause would have affected Ethex's reputation significantly more than the jury verdict. The expected tax benefits of characterizing the damages as for loss of goodwill would be more beneficial to Healthpoint. Healthpoint had proposed an allocation to punitive damages during the settlement negotiations that was significantly less than the

amount of the jury award, thus suggesting that tax considerations had greater importance than punitive motives.

Petitioner also asserts that a statement in McKay v. Commissioner, 102 T.C. at 484, specifically that "[McKay] was never given the freedom to structure the settlement on his own", implies that, in the absence of the ability of one party to draw the settlement allocations without objection, we must respect the settlement for Federal income tax purposes. If, as petitioner argues, a "free hand" to draw the settlement allocation is a necessary rather than a sufficient condition, we could only disregard settlement allocations when the parties to the agreement were completely nonadverse. That result is not justified by our Opinion in McKay.

## Allocating According to Jury Verdict

Respondent contends that the appropriate allocation of the settlement proceeds is according to the jury verdict rendered in Healthpoint's favor. "It is a tenet of federal tax law that income received in settlement of a claim should be taxed in the same manner as if it had been received on that claim in court." Francisco v. United States, 267 F.3d 303, 319 (3d Cir. 2001). The Court of Appeals for the Fifth Circuit, to which our decision here is appealable, has affirmed that a jury verdict is the best indicator of the worth of a plaintiff's claims. Robinson v. Commissioner, 70 F.3d at 38.

We agree with respondent that, in the light of the circumstances of the settlement and the verdict in Ethex I, the allocations made by the jury should be applied to the settlement of Ethex I for tax purposes. However, we must still address the allocations with respect to Ethex II. "'When assessing the tax implications of a settlement agreement, courts should * * * [not] engage in speculation'", but should discern "'the claim the parties, in good faith, intended to settle for.'" Green v. Commissioner, 507 F.3d 857, 868 (5th Cir. 2007) (quoting Bagley v. Commissioner, 121 F.3d at 395, and Dotson v. United States, 87 F.3d 682, 688 (5th Cir. 1996)), affg. T.C. Memo. 2005-250. We have previously used a jury verdict from one case to make a determination as to the character of settlement proceeds for another similar case brought by the same taxpayer, but without a rendered verdict, where the two cases were jointly settled. See Miller v. Commissioner, 93 T.C. 330, 335 (1989) (holding that because the jury did not award damages for emotional distress in one case, the parties did not intend the settlement to include payment for emotional distress in a similar case not yet brought to verdict), revd. on other grounds 914 F.2d 586 (4th Cir. 1990).

Although Healthpoint's complaint in Ethex II alleged misdeeds by Ethex slightly different from those alleged in Ethex I, the cases were very similar. In fact, the settlement

agreement allocated the damages in Ethex I in similar proportions to Ethex II.

Petitioner has not met its burden to show that the allocations according to the settlement agreement in Ethex II should be respected.  The amounts paid to settle Ethex II should be allocated in the same proportions and classifications as those in Ethex I, on the basis of the jury verdict, the above analysis, and respondent's concession.

Applicability of Accuracy-Related Penalty

Section 6662(a) and (b)(1) and (2) imposes a 20-percent accuracy-related penalty on any underpayment of Federal income tax attributable to a taxpayer's negligence or disregard of rules or regulations or substantial understatement of income tax.  Section 6662(c) defines negligence as including any failure to make a reasonable attempt to comply with the provisions of the Code and defines disregard as any careless, reckless, or intentional disregard.  Disregard of rules or regulations is careless if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation.  Sec. 1.6662-3(b)(2), Income Tax Regs.  A substantial understatement of income tax exists if the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).  For penalties that relate to adjustments to

partnership items, the determination of tax motivation and negligence depends on the state of mind of the general partner of the partnership. See Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg. T.C. Memo. 1991-212.

Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose penalties. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). However, once the Commissioner has met the burden of production, the burden of proof remains with the taxpayer, including the burden of proving that the penalties are inappropriate because of reasonable cause or substantial authority. See Rule 142(a); Higbee v. Commissioner, supra at 446-447. Considering the amount of the resulting underpayment of tax, respondent has satisfied the burden of producing evidence that the penalty is appropriate.

Petitioner argues that substantial authority supports the position taken. As explained above, the arguments petitioner offered are not adequately supported by the caselaw and do not show substantial authority. See sec. 1.6662-4(d)(2) and (3), Income Tax Regs. Furthermore, Healthpoint's income tax return did not adequately disclose the position taken with regard to the settlement allocations.

The accuracy-related penalty under section 6662(a) is not imposed with respect to any portion of the underpayment as to

which the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1); Higbee v. Commissioner, supra at 448. The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Taxpayers may satisfy their burden of proof as to negligence by showing that they reasonably relied on the advice of a competent professional adviser. See United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense but rather is a factor to be considered. The Court of Appeals for the Fifth Circuit has held that the reasonable cause/good faith defense is available in a partnership-level proceeding in this Court, provided that it is used as a defense by the partnership itself rather than by an individual partner. Klamath Strategic Inv. Fund v. United States, 568 F.3d 537, 548 (5th Cir. 2009).

Petitioner asserts that Healthpoint relied on the advice of tax counsel hired to oversee the settlement agreement. Petitioner has not proven, however, that tax counsel offered an opinion as to the propriety of the allocations in the agreement. Although Healthpoint's tax counsel provided the outline of the allocations for use in the settlement, he did not participate in

the negotiations with Ethex regarding the total amount of the settlement or the amount of each individual allocation. Petitioner's counterargument that the negotiations were completed between the parties without regard to tax consequences and therefore their tax adviser was not involved, even if true, is insufficient. Petitioner has not otherwise shown that the tax adviser considered the tax consequences of the final agreement. Petitioner is therefore liable for a penalty under section 6662(a), which will be reduced to reflect respondent's concession.

We have considered the other arguments of the parties, and they either are without merit or need not be addressed in view of our resolution of the issues. For the reasons explained above,

<u>Decision will be entered</u>

<u>under Rule 155</u>.